(66 Misc. Rep. 307.)

## BROKAW v. BROKAW.

(Supreme Court, Special Term, Nassau County.   February, 1910.)

1. DIVORCE (§ 37*)—ABANDONMENT.
   There may be an abandonment by a husband of his wife, though he furnishes her with a weekly allowance for support.
   [Ed. Note.—For other cases, see Divorce, Dec. Dig. § 37.*]

2. DIVORCE (§ 37*)—EVIDENCE—DECREE OF SEPARATION.
   Where a husband enters into a written agreement with his wife to avoid certain conduct which had produced an injury to her health, and thereafter, while traveling abroad with her, leaves her, and then serves a formal French notice upon her thereafter to return to him, and where, after another reconciliation with her, he leaves his wife to go back to America alone, and she gets back with the assistance of another, and thereafter, after another reconciliation, he again leaves her, and orders his house closed, and refuses to join her at his home, she is entitled to a decree of separation from him.
   [Ed. Note.—For other cases, see Divorce, Cent. Dig. §§ 107–132; Dec. Dig. § 37.*]

3. DIVORCE (§ 240*)—AMOUNT OF ALIMONY—DETERMINATION.
   Alimony should be fixed with due regard to the station in life of the parties and the circumstances of their separation.
   [Ed. Note.—For other cases, see Divorce, Cent. Dig. §§ 675–678; Dec. Dig. § 240.*]

Action by Mary Blair Brokaw against William Gould Brokaw. Judgment for plaintiff.

Griggs, Baldwin & Pierce (A. J. Baldwin and Charles G. Signor, of counsel), for plaintiff.

Eugene L. Bushe (John F. McIntyre and Edward Weiss, of counsel), for defendant.

PUTNAM, J.   It is not necessary for the court, in declaring its decision, to review the 24 or more distinct charges set forth in the complaint or the recriminatory matters pleaded in the answer or brought out during the hearing.   Although the plaintiff was limited to the acts specified in the complaint, evidence has been received from the defendant's side so widely as to cover nearly the entire history of the marriage relations of the parties to this action down to their final separation on December 15, 1908.

The law of New York does not grant a separation for incompatibility, abusive epithets, or capricious or arbitrary conduct, but allows it only on specified grounds.   The courts intervene to separate the parties when one of them requires protection from the other, or when one has forsaken cohabitation with the other, or when the husband fails to support the wife.   The Code (§ 1762) distinguishes acts of cruelty and inhuman treatment from such conduct as may render it unsafe and improper to continue to cohabit.   The refusal to cohabit is termed an abandonment.   In this case Mrs. Brokaw seeks a legal separation on the three grounds of cruelty, conduct rendering it unsafe and improper to live with her husband, and an abandonment about December 15, 1908.

The investigation of these marital differences has been full and exhaustive. The proofs disclose an increasing incompatibility, intensified by nervous irritation on the part of Mr. Brokaw. He is shown, however, to have provided liberally for his wife, and was especially solicitous for her welfare, furnishing nurses and the best medical care for her during illness.

Mr. Brokaw's tendency to jealousy was early manifested, and is admitted by his friends who have been called as witnesses on his behalf. And, as distrust toward one side leads to counter distrust, recriminations followed, in which Mrs. Brokaw sometimes showed suspicion toward her husband. These recriminations developed into bitter differences, followed, however, by mutual forgiveness and temporary reconciliations.

In view of the charges made, it should be stated that the evidence does not show that the defendant was habitually intemperate. On the contrary, he appears to have been moderate in that respect, although in his nervous condition any indulgence whatever was stated to have been forbidden by his physicians.

In view of the many contradictions arising in this mass of testimony, the court looks, first, at the written agreement of February 21, 1908, within about four months after the marriage—which was prepared at Fairview, N. C., by Dr. Battle. From the professional relation he sustained to the parties, as well as his long acquaintance with the defendant, this document, dictated by him to and written out by the defendant's secretary, becomes important. The agreement was signed by the defendant, followed by Mrs. Brokaw's signature in concurrence, and was witnessed by the Marquis Hermosa, a close personal friend, Walter Byford, the secretary, and Dr. Battle, who had dictated its terms. Just previous to this agreement, it was stated by the plaintiff, and confirmed by Dr. Battle, who was called as a witness by the defendant, that a serious difference had arisen which occasioned injury to the plaintiff's health, producing a condition of hysterical collapse, and that this agreement had been drawn up in order to arrange a temporary separation by the parties. By it the defendant promised to submit the differences to attorneys, with this significant clause:

"In the meantime I also pledge myself to leave Mrs. Brokaw unmolested in every manner whatsoever."

This instrument, prepared and witnessed by the defendant's friends, is strong evidence that the plaintiff had been molested, and confirms the statement of Dr. Battle that these molestations were injuring her health.

Without discussing the various acts which, prior to that time, had been a matter of grievance between the parties, the court finds that the forcible breaking into Mrs. Brokaw's sleeping apartments by the defendant in the daytime and at all hours of the night were acts injurious to her health, and which, if continued, would render it unsafe and improper for her to remain subject to such intrusion. It appears that the defendant, without any special cause, but rather as a matter of habitual enforcement of his wishes, broke in the doors of Mrs. Brokaw's apartments at his own houses at Great Neck and at Fairview.

at the residence of his sister, at hotels in New York City, and at hotels in France; and this was at various hours, extending into the early morning, either when he arrived back at the hotel, or when for any reason he demanded admittance. Considering that Mrs. Brokaw was in an excitable, nervous condition, being under the care of a nurse, she was certainly entitled to the privacy of her room; and such acts as the breaking in of doors, persisted in, tended to interfere with her rest, and, although not accompanied by violence to her person, were plainly disturbing and harmful. It does not appear that these acts of Mr. Brokaw were from bad motives, or with the intention of causing injury; but the repetition of such forcible entries into his wife's rooms, against her remonstrances and the advice of his physicians, produced nervous shocks, sometimes driving her into hysterical conditions, and from which she is entitled to be protected.

Two disputed incidents occurred in which the plaintiff says that defendant threatened her life with a shotgun, one at Fairview and the other in Paris. While such an allusion might have been made in the course of an embittered recrimination, I do not find that such threats were seriously made, or were so regarded at the time.

Special reference has been made to the incidents growing out of the automobile trip from Paris via Fontainebleau to Tours, which are thought important because from this rupture came the first resort, at Paris, to legal proceedings. After the discharge of the plaintiff's nurse at Fontainebleau, which was demanded by Mr. Brokaw because he had been displeased at the nurse's playing the piano in the salon, Mrs. Brokaw was forced to put up with a maid obtained the next morning from Paris, who was far from being a satisfactory substitute for Miss Blanchette, the nurse, who had been the plaintiff's companion since leaving New York. It was natural that the subsequent trip to Tours should be inharmonious; and, on arrival at Tours, there was a rupture between the parties, which resulted in Mrs. Brokaw's returning the next morning to Paris by train, while Mr. Brokaw remained over in Tours for one or two days, and then drove his automobile back to Paris. Instead of rejoining his wife at the Hotel Astoria, where their baggage had been left on their departure for Tours, and where Mrs. Brokaw had come from Tours, Mr. Brokaw took rooms at the Hotel Continental. After consulting Mr. Cachard, of the law firm of Coudert Bros., there was served by a court officer upon Mrs. Brokaw a formal monition or notice to resume (reintegrer) cohabitation, demanding her within 24 hours to come to him at his conjugal domicile, stated as at the Hotel Continental. Inasmuch as the plaintiff was then at the Hotel Astoria, which was the last domicile that she had known as their joint abode, this French notice could have no further effect than to advise her that the defendant had changed his residence to another place and to summon her there to rejoin him. As the parties were eventually reconciled, there was no further resort to the law of France.

Subsequently, when again in Paris, the defendant tried to enter plaintiff's room against her protest, and an accident occurred by which his head was injured as the door was shut upon him. He again consulted his lawyers, with the result that he withdrew from their place

of abode, went to London, separate and apart from his wife, and thence to America by the same steamer. Her transportation was arranged by Mr. Gilbert, his brother-in-law. Mr. Brokaw refused any communication with Mrs. Brokaw from the time of the accident in Paris until after their arrival in New York, notwithstanding her efforts to bring about a reconciliation, or at least the appearance of one, in the hotel at Southampton and on the steamship. Without deciding whether these facts constituted cruelty in the legal sense, they seem sufficient to show that the defendant, on grounds that cannot be regarded as serious, left his wife to the care of others, and on the homeward trip remained apart from her, against her consent, and in a manner to cause embarrassment to her, especially on shipboard.

Shortly after their arrival, they were again reconciled; and, although it is evident that the health of both became more impaired as these controversies continued, they remained in quasi amicable relations until after the parting in October, 1908, when the wife was left at the country house at Great Neck and the husband went to their southern home at Fairview, N. C. During this absence there were daily letters, more frequent telegrams, and, at times, the most minute inquiries by the defendant of the details of every movement that the plaintiff made. The defendant was especially insistent that plaintiff should have no visits at the house, except from a very few friends, that she should not engage in any social functions, even that his sisters should not invite her to their houses when they had other company, and that she should abstain from entertainments in his absence.

About November 8th, at the time of the horse show in New York, Mr. Brokaw sent a large number of telegrams inquiring of her and from her friends and from the servants in the house as to her movements, as the plaintiff had promised not to attend. His telegram of November 9th, after the show had opened, contained a clear intimation of his knowledge of her movements. After repeating that he wished her not to go, he added: "I will also find out if you do go." This is alluded to as indicating the constant inquisition kept up by the defendant over his wife's movements in his absence. Along in December the relations were further strained by Mrs. Brokaw's impression that a house party was to be given at Fairview to which she was not to come, and, on the other hand, by Mr. Brokaw's fears that his wife was transgressing her promises not to go out at Great Neck.

A trifling incident occurring on Sunday, December 13th, appears to have brought about the present separation. On that morning Mrs. Brokaw was called on the telephone by some friends who were then on an automobile trip, asking if they could lunch at her home that day. It was difficult to decline such request. The party came and had luncheon, arriving at about 1 o'clock and leaving at 3, and consisted of three ladies and three gentlemen, against whom there is no breath of suspicion. Later a lady arrived who had previously arranged to come Saturday to spend Sunday, but had been detained so that she reached Great Neck late Sunday afternoon. She was accompanied by a gentleman escort, who remained in the house overnight, leaving early the next morning. The incident was an ordinary one,

with nothing approaching blame or criticism. These facts, perhaps exaggerated in the channels through which they came to Mr. Brokaw, caused him at once to inquire by telegraph the names of the men, which Mrs. Brokaw answered, giving their last names. Mr. Brokaw then telegraphed asking their initials, with a demand for the name of the fourth man, who had escorted the lady to dinner and remained overnight. Before this was answered, the defendant sent two telegrams, as follows:

"Dec. 15, 1908.

"To Mrs. Brokaw, Great Neck: I am closing house at Great Neck next week. Communicate with Mr. Bush. Will not have any more men visiting my house except your brother or your family. If these instructions are not carried out, my servants shall refuse to serve them."

"High Point, N. C., Dec. 17, 1908.

"To Mrs. J. A. Blair: I am very sorry to have been compelled to close my house in Great Neck and to start proceedings for a separation from Mary. Her actions culminates in a house party last Sunday forced me to this step. She entertained three ladies and three men, two ladies I do not approve of and the third I don't know at all. The men I don't know either and Mary refused to give me their first names. She allowed one man to occupy my bedroom next to hers over night, while she put the nurse and one of the ladies in the bachelor quarters. She failed to give me that man's name and an explanation of this peculiar action in spite of my request."

Thereafter, the house was closed. The defendant, however, through his attorney, provided a weekly allowance of $150, which continued until this action was brought. It seems to be argued that this closing of the house and referring Mrs. Brokaw to Mr. Bushe, his attorney, did not constitute an abandonment within section 1762 of the Code, because the defendant continued to support the plaintiff by means of this weekly allowance.

At the very time that this step was taken by the defendant (December 14th), he received a request from his wife to rejoin him at his home at Fairview. No overtures for a reconciliation appear to have been made; and this incident, which from a full examination is shown to have been trifling and without blame on the part of any one, has led to the separation which has since continued. The statement that he would start proceedings for a separation, coming with the closing of the Great Neck house, was a clear declaration of Mr. Brokaw's purpose; and this statement of his determination was not afterward withdrawn or modified. To say that this is not an abandonment within the meaning of the Code, because defendant gave plaintiff $150 a week, is to limit an abandonment to cases only where no support is furnished. Such a rule would make the husband the arbiter of the allowance to the wife from whom he separates, and take from her the legal means of reviewing his conduct. This was none the less an abandonment because of the payments through the defendant's attorney. The closing of the house, the form of the notification given, and especially the telegram to the mother of the plaintiff, are clear evidence of an intent permanently to separate from the wife, without her consent, and without justification. Williams v. Williams, 130 N. Y. 193, 29 N. E. 98, 14 L. R. A. 220, 27 Am. St. Rep. 517. Clearman v. Clearman (Sup.)

2 N. Y. Supp. 356; Magrath v. Magrath, 103 Mass. 577, 4 Am. Rep. 579.

The plaintiff is therefore entitled to a decree of separation on the grounds of Mr. Brokaw's conduct rendering it unsafe and improper to live with him, and because of the act of abandonment and separation by Mr. Brokaw in December, 1908.

The evidence of the financial means and yearly income of the defendant is not clear or convincing. The defendant declined to testify to the correctness of the statement presented at the conclusion of the trial, which showed acknowledged assets of $1,639,939 and a gross income of $71,000, from which was estimated a net yearly income of $46,706. In the defendant's affidavit upon the motion for alimony pendente lite, verified abroad, he stated his yearly income as $70,000. If alimony depended on a fixed fraction of income, the court would not regard the defendant's evidence on the trial as overcoming the inference of greater financial means from the proof by Mr. Armstrong that far larger amounts than are now admitted were paid defendant from his father's estate prior to May 1, 1907. It is, however, settled that alimony is not based on a definite part of the husband's estate, or his yearly income. Considering the station in life of the parties, and the circumstances of this separation, the court fixes the alimony to be paid to Mrs. Brokaw by Mr. Brokaw as $15,000 a year, payable in equal monthly installments of $1,250.

The indefiniteness as to defendant's personal property and the nature of the investments disclosed at the trial raise the question whether some provision for security for the payment of the alimony should be embodied in the decree. Code Civ. Proc. § 1772. Although the defendant is a freeholder, with a legal residence within this county, the question whether or not to provide for such security is reserved until the settlement of the decree. The decree, therefore, should direct that alimony, as herein fixed, shall begin from the date of the entry of the decree, for the maintenance and support of the plaintiff during her natural life; such payments not to be in lieu of the plaintiff's right of dower in the defendant's real estate.

Findings and decree in accordance with the foregoing are to be settled on the usual notice.

Judgment accordingly.